IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 26, 2022 Session

## STATE OF TENNESSEE v. PATRICIA KAYE WILKEY

**Appeal from the Circuit Court for Rhea County**
**No. 2017-CR-112    J. Curtis Smith, Judge**

_____

### No. E2021-00549-CCA-R3-CD

_____

The Defendant, Patricia Kaye Wilkey, appeals her conviction of first degree premeditated murder, for which she received a sentence of life imprisonment.  On appeal, the Defendant asserts that (1) the evidence is insufficient to support her conviction; (2) the trial court improperly limited defense counsel's cross-examination of the State's witnesses; (3) the trial court erred in admitting hearsay statements; (4) the State made improper comments during closing arguments; and (5) the trial court imposed an excessive sentence.  Upon reviewing the record, the parties' briefs and oral arguments, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

D. Marty Lasley, Chattanooga, Tennessee, for the appellant, Patricia Kaye Wilkey.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Senior Assistant Attorney General; J. Michael Taylor, District Attorney General; and David Shinn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

The Defendant was charged with first degree premeditated murder for killing her husband, Mr. Thomas R. Wilkey, Jr., by shooting him twice in his head while inside their home in April 2017.  The Defendant initially told police officers that she arrived home to

find the victim dead but then later gave a statement to the police in which she maintained that she shot the victim in self-defense.  She pursued a claim of self-defense at trial.

## The State's Proof

Ms. Beverly Wilkey Louallen, the victim's sister, testified that the victim and the Defendant initially married in their late teens.  They divorced, married other people, and then remarried each other in May 2013 after their other marriages ended.  Following their marriage in May 2013, the victim moved into the Defendant's house located on the Dayton Mountains in Rhea County, Tennessee.

On April 24, 2017, the Defendant called 911 and calmly reported that she had returned home to find the fifty-one-year-old victim dead on the kitchen floor.  According to the recording of the call, which was entered into evidence at trial, when asked whether the victim had any health issues, the Defendant responded, "He's been shot."  The operator instructed the Defendant to leave the room, and the Defendant reported that she was at her mother's home located across the street from her home.  When asked where the victim had been shot, the Defendant responded, "When I pulled the blanket back, it looked like in the head."  The operator asked the Defendant whether the victim committed suicide or was murdered, and the Defendant stated that she did not know, that she had not seen a gun, and that it appeared as if the victim had been deceased for some time.  When asked whether the victim had been depressed, the Defendant stated that the victim had been "talking strange for the past couple of weeks."  The Defendant reported that she had left the home earlier that morning and returned home to find the front door open, that she entered the home and saw a blanket on the kitchen floor, and that she pulled back the blanket and recognized the victim wrapped up in the blanket.

Deputy Kyle Akins with the Rhea County Sheriff's Department ("RCSD") was dispatched to the Defendant's home.  He testified that when he arrived, no one was at the home, and the front door was locked.  The Defendant walked to the home from her mother's house located across the road.  She told Deputy Akins that the front door was open when she came home and that she entered the house where she discovered the victim on the floor.  She stated that she believed she left the key to her home at her mother's house, returned to her mother's house, and then yelled from across the street that she must have left the key inside her own home.  Officers had to kick in the front door.

Deputy Akins testified that once he entered the home, he observed what he determined to be a body wrapped in garbage bags and a blanket on the floor.  He cleared the home to ensure that no one else was inside.  He stated that the washing machine was running and set on fifty minutes and that there was a "very strong" odor of bleach

throughout the home. On cross-examination, Detective Akins testified that he had been to the home on prior occasions. He recalled an occasion in December 2015 during which both he and Detective Mike Bice went to the home.

RCSD Detective Chris Hall also responded to the scene and testified that the victim's body had been wrapped in plastic, which was secured with packing tape, and then wrapped in a blanket. He stated that the dispatcher reported that the victim had been shot in the head and that the Defendant reported to both the 911 operator and Detective Bice that the victim had been shot in the head. Detective Hall testified that he began questioning the Defendant's claims because there were no openings in the plastic around the victim's head that would have allowed the Defendant to peer inside the plastic and conclude that the victim had been shot in the head. The victim's leg was sticking out of the bottom of the plastic, and two latex gloves were inside the blanket. While searching the home, Detective Hall located two empty boxes of latex gloves and two sets of latex gloves in the kitchen. Officers located a box of black trash bags in the kitchen similar to the plastic bags in which the victim's body was wrapped, and they found a pair of scissors and a roll of clear packing tape in the master bedroom.

Detective Hall testified that he detected a strong odor of bleach in the home and that the washer was operating. Officers unplugged the washer, removed the clothing, including towels and a pair of pink and gray shoes, and hung them to dry on a fence outside before packaging them. A spray bottle of bleach was located in both the kitchen and the master bedroom. Detective Hall stated that while he observed clutter throughout the house, he did not observe any evidence of a struggle. Officers did not locate any firearms inside the home. Two safes were inside the master bedroom, but officers did not have the combinations to the safes and were unable to unlock them. Officers observed what appeared to be blood on the interior bottom of a plastic wagon located near an outbuilding. Swabs were obtained from the wagon and sent to a laboratory for testing.

On cross-examination, Detective Hall testified that he had known the victim for several years and that when he opened the plastic bag, he recognized the victim as the person inside the bag. Detective Hall did not believe he had been to the victim's house prior to the shooting and said he had never, in his professional capacity as a police officer, had any encounters with the victim. Detective Hall stated that he observed "clutter" throughout the house and that he had no evidence that the gloves, cleaning supplies, and garbage bags were purchased close in time to the shooting.

Special Agent Cody Rowlett, a latent print examiner with the Tennessee Bureau of Investigation ("TBI"), found one latent fingerprint belonging to the Defendant on a garbage bag that had been wrapped around the victim. Special Agent Rowlett did not find any identifiable latent prints on the tape that had secured the garbage bag. TBI

Special Agent Miranda Gaddes with the microanalysis or trace evidence unit compared the tape from the garbage bags to the roll of clear packing tape found in the master bedroom and determined that they were consistent in appearance, construction, width, and backing.

TBI Special Agent Lisa Burgee, a forensic scientist with the forensic biology unit, testified that she examined four latex gloves, two of which had the victim's blood on them. She also swabbed unstained areas of the same two gloves. She obtained DNA profiles on both gloves that were consistent with at least two individuals. On one glove, the victim and the Defendant were consistent with being contributors to the mixture profile. On the other glove, the victim was the major contributor to the mixture profile, and results from the minor profile were inconclusive.

Special Agent Burgee also tested a pair of shoes, and presumptive testing on both shoes indicated the presence of blood. She did not test for hemoglobin due to the limited sample for each shoe. She was unable to obtain a DNA profile from the right shoe. She obtained a limited DNA profile from the left shoe, but the results were inconclusive.

Dr. Christopher Lochmuller, a forensic pathologist with the Knox County Regional Forensic Center, performed the autopsy of the victim, who was five feet, seven inches tall and weighed 224 pounds. Dr. Lochmuller testified that the victim sustained two gunshot wounds to his head, one to the right side of his face around his right cheek and the other to the left side of his head past his left cheek. Both gunshot entry wounds were surrounded by gunpowder stippling, which Dr. Lochmuller stated indicated that the muzzle of the gun was at least two to three feet away from the skin when the gun was discharged. He said that soot could have been removed when the victim's body was moved and wrapped in plastic and a blanket and that the presence of such soot would have indicated that the gun was shot from a closer range. However, due to the absence of the soot, he could only opine that the gun was fired when the muzzle was "at the very least" two to three feet away and, thus, was "at least" an intermediate range of fire.

One bullet entered the victim's right cheek, passed through his cheekbone and part of the base of his skull, and stopped under the skin behind his right ear. The bullet did not enter his brain. Dr. Lochmuller testified that the wound was not fatal or incapacitating by itself and that the victim should have been able to move after receiving the wound. Dr. Lochmuller recovered pieces of the projectile from the wound. The other bullet entered the left side of the victim's face just past the cheek, traveled through his skull and the left side of his brain, and stopped at the base of his skull, where Dr. Lochmuller recovered the projectile. The wound caused hemorrhaging around the victim's brain and was an incapacitating injury. Dr. Lochmuller stated that it was unlikely that the injury would have been survivable even if the victim had obtained

immediate care. He said both bullets traveled front to back and downward. He was unable to determine the exact positions of the victim and the shooter at the time of the shooting but stated that "as long as you maintain a line through the muzzle of the gun and through the trajectory to the victim's body, … you can put the [victim and the shooter] in different positions."

Dr. Lochmuller testified that the victim was in a mild state of decomposition, which was consistent with information that approximately sixteen hours had passed between the shooting and the 911 call. The toxicology results established that the victim had an alcohol concentration of 0.56 in his blood. The victim's blood also had caffeine; nicotine; two sedatives, Xanax and Diazepam, also known as Valium; and two pain killers Hydrocodone and Oxymorphone. On cross-examination, Dr. Lochmuller testified that he did not have the expertise required to determine how the drugs interacted or affected the victim while he was alive.

Dr. Lochmuller testified that he was unable to determine the sequence of the shots based purely on his physical findings. He stated that given the extent of the victim's injuries from the gunshot wound to the left side of his face, the victim should have died within seconds or minutes of receiving the injury. Dr. Lochmuller said that because he believed the gunshot wound to the right side of the victim's head was not incapacitating, the victim should have been able to fight, operate a gun, or flee upon receiving the injury. Dr. Lochmuller also said that because the gunshot wounds were on opposite sides of the victim, there was movement by either the shooter, the victim, or both between the two shots.

TBI Special Agent Laura Hodge, a forensic scientist with the firearms and tool mark identification unit, testified that she examined two bullets and determined that they were .38 caliber class bullets that were consistent with Winchester brand silvertip hollow point bullets. She determined that both bullets were fired from the same .38 caliber class firearm. She was not provided with a firearm to compare to the bullets but agreed that the bullets could have been fired from a Smith & Wesson Bodyguard revolver ("Bodyguard"). Special Agent Hodge stated that a Bodyguard has a two-inch barrel, holds five rounds of ammunition, and can be easily carried and concealed. The Bodyguard has an internal hammer and is considered to be a double action revolver where the shooter is not required to manually cock the hammer but must simply pull the trigger to fire. The Bodyguard can be carried in a person's pocket without a holster and without fear of the gun firing unless the trigger is pulled. Special Agent Hodge testified that a Glock is a brand of semiautomatic pistols, which have magazines. She did not believe there was an advantage or disadvantage that a Glock would have over a Bodyguard without considering the shooter's skill level.

Mr. Buford Kizzar testified that he lived on Graysville Mountain near bluffs that overlooked Sequatchie Valley in Bledsoe County. He stated that in April 2017, during the early morning hours, a woman came to his home and said she had gotten her car stuck over the bank. She asked Mr. Kizzar to help pull her car out of the bluff. Mr. Kizzar followed the woman to an area located an eighth of a mile away where he saw her car stuck approximately forty yards over the bluff. Mr. Kizzar was shown a photograph of the Defendant's car and stated that the car appeared similar to the car stuck in the bluff. Mr. Kizzar and a man with a four-wheel drive Jeep connected a cable to the car, and the Jeep pulled the car up over the bank.

The State called RCSD Detective Mike Bice as its final witness. Detective Bice testified that he went to the scene of the shooting on April 24, 2017, and spoke to the Defendant, who initially told him that on the previous night, the victim left in a dark-colored truck with a chrome grill. She said that she did not know who was in the truck and that the victim did not return that night. The Defendant stated that when she returned home from a doctor's appointment on April 24th, she found the victim on the kitchen floor. She said she "panicked" and called another person, who advised her to call 911 and report what she had found. The Defendant consented to a search of her home, and Detective Bice assisted officers in clearing the home where he observed a large plastic bag covered with a blanket and a foot sticking out of the bag.

The Defendant was transported to the sheriff's department where Detective Bice and TBI Special Agent Keith Herron interviewed her on April 24th, after she waived her rights and agreed to speak with them. A recording of the interview was entered as an exhibit and played for the jury at trial. The Defendant, who Detective Bice estimated was five feet to five feet, one inch tall, confirmed that other than her "regular medicine from the doctor," she had no drugs in her system and was not under the influence of drugs or alcohol.

The Defendant told the officers that she left her home between 9:00 and 9:15 a.m. on the morning of April 24th, believing she had a doctor's appointment at 10:00 a.m. She said that after she realized that her appointment was actually the following day, she turned around and returned home at approximately 11:00 a.m. She stated that the front door was open and that she believed the victim had returned home. She entered the home and walked "straight into the laundry room" where she began washing a load of towels in the washing machine. She then walked into the kitchen where the lights were off and noticed a blanket on the floor. She stated that she "flipped [the blanket] off" and saw a body. She said she knew the body was that of the victim because "his sock was showing." She stated that she was "in a panic," removed some of the tape from the garbage bag, peered into the bag, and saw the victim's face and blood. She explained that she assumed that the victim had been shot in his head due to the amount of blood on

his face and clothing.  She went to her mother's home located across the street from her home, but her mother was not at home.  She stated that she called Mr. Greg Roberson, a family friend, before calling 911 because she was "in a panic" and did not know what to do.

The Defendant told the officers that she and the victim had been married for five or six years and that the only fight between them resulted in her calling the police.  She stated that the fight occurred after the victim had been drinking liquor and that "you know him and liquor don't mix."  The Defendant said the victim had a psychotic episode two or three weeks prior to his death, and Detective Bice stated, "Yeah, that's what I'm talking about.  He'd gotten worse."  The Defendant continued that the victim had been saying "weird stuff" about "wanting to kill people" and how he was previously hired to kill others.  She said that she became frightened and that the victim refused to seek treatment.  She stated, "But as far as he and I fighting or anything no.  I mean, our relationship was fine.  I mean, we had our disputes."  She also stated that she had asked the victim for time apart following an altercation between the victim and the Defendant's brother, after which the Defendant's granddaughter refused to visit her at her home.

The Defendant told the officers that the victim had not been at home at least one night a week for the past three weeks and that he left the previous night between 11:00 p.m. and 1:00 a.m.  She said that whenever she asked the victim about his leaving, he would reply, "[T]he less you know the better off you are."  The victim would not tell her the identity of the person whom he was meeting.  The Defendant stated that she saw text messages between the victim and another woman during which the victim asked the woman "to hook up" and the woman rejected him.  The Defendant stated that when she confronted the victim, he told her that she was "crazy."  She said that the victim was drinking alcohol and taking pills, that she told him to stop, and that she would check him for needle marks because he had used needles in the past.

Detective Bice told the Defendant that it was not a "secret" that the victim "was not happy" and that the victim "made a lot of threats."  The Defendant responded that the victim had his Bodyguard on him at all times.  She recalled that the victim and her brother were involved in an altercation during which she stepped between them.  She stated that her brother later told her that although the victim did not pull a gun on him, the victim's nine millimeter firearm fell out of his pocket.  The Defendant said that she did not see the victim point a gun at her brother and that she only saw the victim carry a Bodyguard.

The officers asked about scratches that were on the Defendant, and she stated that she walked thought a briar patch earlier that morning while attempting to feed deer on her property.  Detective Bice challenged the Defendant's claim and stated, "I know how [the

victim] was, and I don't know how you've survived this long, I don't." Detective Bice told the Defendant, "I think that [the victim has] put more on you than what you could handle. I believe that in my heart. I believe [the Defendant] had had enough. [The Defendant] was fed up with it." Detective Bice told the Defendant that the officers would be able to obtain DNA and fingerprints from the scene and that she needed to tell them everything that occurred. Detective Bice continued,

> [The Defendant] had enough, didn't she? You know what, I know what the hell you went though. [The Defendant] had enough. She didn't want no more of the shit. She was also afraid of [the victim]. He threatened to shoot this one, and shoot that one. Hell, he's pulled that gun on more people than not, including [the Defendant's brother]. I believe that. Just shoot me straight.

The Defendant then told the officers that the victim retrieved his .40 caliber Glock ("Glock") from the safe and "put it to my eyes." The victim told her that when she had him move in with her, she "took everything away from him." The victim stated that he previously was making a good income and had a place to live and that if the Defendant kicked him out, he would have no place to go. The Defendant said the victim threatened to call her doctors and have her medications related to her mental health and "everything" taken away. She maintained that she believed the victim was going to kill her and began crying. She said that the victim lay down on the bed and laid "the gun" beside him and that the Bodyguard was lying on the other side of him. She stated that "before [she] knew it," she shot the victim, that he tried to get up, and that she shot him again.

The Defendant told the officers that she rolled the victim off the bed and used a wagon to transport him into the kitchen and that she was unable to move him any further. She wrapped the victim in a plastic garbage bag and threw the gun off a bridge. She said that at approximately 9:00 p.m. on the previous night, she threw the bedding off the side of a bluff on Graysville Mountain near Mr. Kizzar's home, that she walked to his home and sought help after her car became stuck, and that a man with a Jeep was able to pull her car out of the area. She later said she disposed of the bedding earlier in the morning rather than the previous night. She said the clothes in the washing machine were only towels, none of which had blood on them. She explained that she discarded the only bloody towel with the bedding and that her shoes only had her own blood on them.

The Defendant relayed to the officers that when she shot the victim, he was on the side of the bed facing the window but was not sleeping. She stated that when she shot him, he attempted to "jump up and get the gun, but [she] shot him again." She agreed she first shot the victim on the right side and then on the left side but later stated that she did not know "exactly" where she shot the victim. She said that it was likely "yesterday

evening" when she shot the victim, that she did not know the time of the shooting, that "[e]verything's just blurred," and that she may have shot him about three hours before dark. Detective Bice asked the Defendant, "What happened to the .40 caliber that he had?" The Defendant replied, "He's taken it to the safe." She agreed that she threw the Bodyguard revolver off a bridge.

Detective Bice testified at trial that when he began interviewing the Defendant, the identity of the body in the plastic bag had not been confirmed. He stated that he did not know whether any of his statements to the Defendant about the victim and his life were true and explained that he was attempting to build a rapport with the Defendant.

The Defendant agreed to show the officers the location where she discarded the bedding. She directed the officers to a bluff overlooking the Sequatchie Valley near Mr. Kizzar's home and approximately nine miles from the Defendant's home. While the Defendant remained in the backseat of the patrol car, she pointed out the area where she threw the bedding. Officers recovered two plastic bags that contained the bedding and a towel, and Detective Bice testified that blood appeared to be on the linens. Special Agent Burgee determined that the victim's blood was on a towel recovered from the bag.

Detective Bice testified that in June 2018, he responded to a call off a highway where he found the Defendant sitting in a ditch with her back to the road. Detective Bice asked the Defendant what she was doing. The Defendant was crying and stated that she was going to jail for a long time. Detective Bice asked her whether she was suicidal or needed help or whether he could take her anywhere. The Defendant responded that she was going to jail for a long time for killing the victim.

On cross-examination, Detective Bice testified that he had known the Defendant for approximately twenty-six years and that the victim had worked for RCSD as a patrol officer approximately twenty years prior to trial. Detective Bice stated that he did not know the identity of the person in the plastic bags when he interviewed the Defendant. He stated that he assumed the body was that of the victim but that he "wasn't a hundred percent sure." He testified that he had never arrested the victim previously and had no personal knowledge of whether his statements to the Defendant during the interview regarding the victim's violent actions were true.

Detective Bice testified that although he did not respond to the scene of an incident that occurred in December 2015, he recalled that the victim was arrested the following day. Detective Bice said that he was unaware of what occurred and never saw photographs of bite marks resulting from the incident. He stated that he was not part of a group of officers who responded to a scene several months prior to the shooting in an

effort to transport the victim to Rhea County Medical Center and that he had no personal knowledge of the victim's suffering psychotic episodes.

Detective Bice acknowledged that he was aware that the victim had been arrested on prior occasions. Sometime prior to April 24, 2017, Detective Bice went to the home of the Defendant and the victim to assist officers in serving a warrant. When he arrived, the officers informed him that the victim would not come to the door. The officers knew that the victim had guns inside the house, and Detective Bice agreed that the officers were concerned for their safety. Detective Bice opened the back door to the house and identified himself for the victim, and officers were able to arrest the victim without incident. Detective Bice stated that he did not know the basis for the victim's arrest but that he was aware of the arrest when interviewing the Defendant. Detective Bice acknowledged that he told the Defendant multiple times during the interview that he was aware that the victim had abused her. Detective Bice testified that he was aware of only one incident of abuse but that he also had heard "rumors." He also testified that the victim did not have a reputation in the community for violence, stating, "He had a reputation that he wouldn't take nothing. Now, if you call that violence, then I guess that's violence." Detective Bice acknowledged that he testified at a prior hearing that he had heard that the victim was a violent man. He stated that while he had heard "rumors," he had no personal knowledge of the victim behaving violently.

Detective Bice testified that the Defendant told him that she called Mr. Greg Roberson, a former officer with the RCSD, before she called 911. Detective Bice spoke to Mr. Roberson, who acknowledged that the Defendant called him and that he advised the Defendant to call 911. Detective Bice agreed that the Defendant's cooperation allowed officers to quickly and easily recover the linens that she discarded. Officers searched the Tennessee River in the location where the Defendant stated that she discarded the gun, but the officers were unable to find the gun. Detective Bice stated that defense counsel later brought a Glock to him, but Detective Bice testified on redirect examination that he did not know whether it was the same Glock involved in the case.

The State rested its proof, and the defense made a motion for a directed verdict, which the trial court denied. The trial court found that the issue of self-defense had been fairly raised by the proof and allowed the Defendant to present evidence of prior bad acts committed by the victim.

**The Defendant's Proof**

Officer Bobby Combs of the Soddy-Daisy Police Department, a former officer with the RCSD, testified that on December 8, 2015, he signed an affidavit of complaint against the victim, charging him with interfering with emergency calls and domestic

assault based upon an incident that occurred on December 7th. Officer Combs responded to a domestic call and spoke to the Defendant at her mother's home. As a result of the conversation, he transported the Defendant to the RCSD where he took a statement from her and made photographs of a bite mark on her right shoulder blade. Officer Combs stated that he observed teeth marks in the area, that the Defendant said the victim had bitten her, and that the Defendant would have been unable to cause the injury herself based upon the location of the wound.

Officer Combs testified that when he and other officers went to the home of the victim and the Defendant to arrest the victim, the officers remained outside the home because they learned that the victim had threatened to shoot the officers when they arrived. The officers were concerned for their safety because they knew the victim had weapons inside the home. The officers were aware that the victim had a scanner inside the home, so they communicated with the victim through their radio in an effort to persuade the victim to come outside. Officer Combs stated that the officers left the home that night without arresting the victim because the victim was alone inside the home, the Defendant was being transported to a safe haven, and no one else was in danger. The Defendant decided against prosecuting the victim.

Officer Combs testified that while serving as an officer with the RCSD for seven years, he had the opportunity to observe the victim, arrest him, or hear about his reputation. Officer Combs stated that when the victim was sober, he was "one way" but that he became aggressive when he was drinking alcohol.

Mr. Greg Roberson, a retired officer from the RCSD, testified that he had known the Defendant for a long period of time. On April 24, 2017, at approximately 11:05 a.m., the Defendant called Mr. Roberson, and they began a "general conversation" during which they were "chitchatting." Mr. Roberson said that the Defendant did not seem quite like herself and that when he asked her what was wrong, she "hesitated" and said, "[N]othing really." In response to continued questioning by Mr. Roberson, the Defendant said she did not know whether she needed to involve him or bother him "with this" and that "it's [the victim]." The Defendant told Mr. Roberson that she went "to town" and that when she returned home, she found the victim lying on the floor. Mr. Roberson asked whether the victim was intoxicated or passed out, and the Defendant responded that she did not know. She stated that the victim left the home with friends and that she found him when she returned home. She said that she did not believe that the victim was breathing and that she had not yet called 911. Mr. Roberson instructed her to call 911 and go across the street to her mother's home to wait for medical personnel to arrive. The Defendant stated that she would do so and ended the call. Mr. Roberson spoke to the Defendant over the telephone at 11:21 a.m. and asked her whether the ambulance had arrived, and the Defendant stated that it had not. Mr. Roberson asked her

- 11 -

whether she had called 911, and she said that she went to her mother's house but that no one was at home. Mr. Roberson instructed the Defendant to call 911 and ended the call. A few days later, Mr. Roberson provided a statement to the RCSD regarding his conversation with the Defendant.

Mr. Roberson testified that sometime prior to April 2017, he and other officers, including Officer Combs, responded to a domestic assault call at the home of the Defendant and the victim. Mr. Roberson recalled that the dispatcher stated over the radio that the victim was inside the house and had threatened to shoot any officer who attempted to enter the house. Mr. Roberson remained in his patrol car and conducted a rolling perimeter of the area to ensure that the victim did not escape the house through a window or the back door.

Mr. Roberson testified that shortly after this incident, he and other officers responded to the local hospital after medical personnel requested assistance due to the victim's unruly behavior. The officers were requested to restrain or watch the victim. Mr. Roberson observed the victim "howling," "screaming," and stating "non understandable words." Mr. Roberson stated, "There was some gibberish, what I would call just nonsense type of stuff. It's like being in a frequency that doesn't exist yet. I don't know who he was talking to." Once the victim saw Mr. Roberson, the victim engaged in a "torrent of abuse" toward him for approximately seven or eight minutes. The victim told Mr. Roberson, "I will get you….You can bet on it. I'll get you." The victim then returned to "the delirium."

Mr. Roberson testified that over the years, the victim began exhibiting threatening mannerisms toward police officers. He stated that in addition to the two incidents, the victim was involved in an accident in Spring City where he attempted to run over a patrol car while an officer was inside the car. Mr. Roberson did not witness the incident and was unaware of whether the victim was charged with or convicted of any offenses as a result. Mr. Roberson testified that the victim had "become a very dangerous individual to the community." He stated that the victim "didn't care who he threatened," and Mr. Roberson knew he needed to stay away from him. Whenever he was called to a scene in which the victim was involved, Mr. Roberson ensured that another officer also was dispatched to the scene. He believed the victim "had become a very dangerous and threatening, non-trustable individual."

Ms. Brenda Cornett, a friend of the Defendant who lived less than one-half of a mile away from her, testified that on the night of December 7, 2015, the victim knocked on her door and that she opened the door to find the victim holding a "couple" of rifles and a pistol that he always carried with him. The victim told Ms. Cornett that he and the Defendant had argued, that he had bitten the Defendant, that he had wrecked his truck

within walking distance of Ms. Cornett's home, and that he needed a ride to his father's home. Ms. Cornett stated that she was alarmed because the victim was "pretty li[t], drugged, messed up" and that he was "[p]retty mean" whenever he was in such a condition. Ms. Cornett agreed to drive the victim to his father's house because she did not want the victim in her home with her grandchildren while he was intoxicated and in possession of guns. During the drive, the victim told Ms. Cornett that he became angry with the Defendant when she refused to give him the combination to her safe so that he could take her prescription pain medication. The victim stated that he broke the Defendant's cell phone and bit her, and he asked Ms. Cornett to speak to the Defendant on his behalf.

Ms. Cornett testified that the victim came to her house on several occasions following altercations with the Defendant. Ms. Cornett said the victim was intoxicated by alcohol or drugs on each occasion. She stated that the altercations between the victim and the Defendant revolved around the victim's demands for the Defendant's medication and the Defendant's refusal to provide the medication to the victim. Ms. Cornett testified that the victim asked her whether she knew anyone from whom he could obtain medication and whether she would seek to obtain medication for him from the Defendant. Ms. Cornett stated the victim sold medication to others. She said that the victim told her once that he had pushed the Defendant down and that the victim told her on multiple occasions that he was going to kill the Defendant. The victim stated that he would cut the Defendant into pieces and that he would get away with it. Ms. Cornett relayed the victim's threats to the Defendant and stated that she was worried that the victim might carry out his threats.

Ms. Cornett testified that approximately three weeks before the victim's death, he came to her home while extremely intoxicated. He was upset that the Defendant refused to give her medication to him, and he threatened to kill the Defendant. While driving away from Ms. Cornett's home, the victim struck a parked vehicle, breaking the window of his own vehicle. Ms. Cornett stated that the victim also attempted to control the Defendant by taking her cell phone and refusing to allow her to speak to her friends. Ms. Cornett that said the victim's behavior worsened after December 2015 and that she advised the Defendant to leave the victim on several occasions.

On cross-examination, Ms. Cornett testified that she considered the Defendant to be one of her best friends, but she denied that she would lie for her. Ms. Cornett never reported the victim's threats or his car accident to the police when they occurred or after the shooting. She acknowledged that she had prior theft convictions.

Ms. Nancy Megaris, whose daughter was once married to the victim, testified that the victim threatened to kill her many times. She said the victim always carried a weapon

and "would play with it a lot when I was around him." She recalled that on one occasion, while she was sitting at a red light in her vehicle with her window down, her daughter approached her and struck her in the face while the victim remained in his truck screaming, "Kill her." Ms. Megaris called the police but decided against further prosecution of the charges. She stated that three or four years after the victim and her daughter divorced, the victim called Ms. Megaris, cursed at her, and threatened to "whoop" her husband and kill her. Ms. Megaris did not report this threat to the police.

Ms. Sherry Sneed, a friend of the Defendant, testified that she visited the Defendant at her home at least once a week after she married the victim. Ms. Sneed witnessed at least three to four arguments between the victim and the Defendant. Ms. Sneed recalled an incident approximately one year prior to the victim's death during which the Defendant went to the safe in her bedroom to remove coins that she had collected and the victim put a gun to the Defendant's head and instructed her not to open the safe. Ms. Sneed stated that the victim was drinking alcohol during that occasion, that the victim was "always drinking" and always had a gun with him, and that when the victim drank alcohol, he was "hateful" and "rude."

Ms. Sneed acknowledged that she was on probation and that in 2018, she was charged with possession of a controlled substance. She stated that she had no other arrests prior to 2018. On cross-examination, she agreed that she was convicted of shoplifting in February 2016 and that she had a prior conviction for possession of drug paraphernalia.

Dr. Mark Randolph Ofenloch, a licensed psychologist, testified that the Defendant had been a patient since 2003 and that the Defendant had been treated and prescribed medication for major depressive disorder, attention deficient hyperactivity disorder, and generalized anxiety disorder. He stated that the Defendant likely qualified as having post-traumatic stress disorder ("PTSD"). He observed that the Defendant had been repeatedly exposed to abuse and had suffered "more than her share of trauma" throughout her life.

Dr. Ofenloch testified that he understood that the Defendant suffered abuse during her first marriage with the victim but that the Defendant never mentioned that the victim physically abused her during their second marriage. The Defendant's first visit after the December 2015 incident was in February 2016, and she never told Dr. Ofenloch about the incident. Dr. Ofenloch stated that he often treated abused women who did not disclose the abuse to him and that he would learn of the abuse later. He explained that people fail to disclose abuse for a variety of reasons, including a feeling of shame and blaming themselves for the abuse. He reviewed the transcript of the Defendant's

- 14 -

interview with police officers and stated that he believed Detective Bice likely knew the Defendant well and "knew that there were issues and he was hitting the right buttons."

Dr. Ofenloch testified that the Defendant mentioned periods during which the victim was exhibiting symptoms of a psychotic episode and that the Defendant expressed concern about the victim's behavior and substance abuse. According to Dr. Ofenloch's notes, the Defendant told him in March 2017 that she wanted a divorce but that the victim threatened to contact her medical providers and lie to them in an effort to induce them to take away her prescriptions for medication.

Dr. Ofenloch testified that the Defendant had expressed grief since the shooting and that he believed she wished it had not occurred and that "she had not been put in the position." She felt guilt for having killed the victim and reported episodes of uncontrolled crying as she attempted to process the victim's death. Dr. Ofenloch stated, "[T]here is no indication that she intended or wanted to kill him, and she describes a situation that certainly sounds like self-defense." When asked how the Defendant's diagnoses affected her in a situation where the victim was pointing a gun at her, Dr. Ofenloch testified, "It actually could go both ways." He explained that someone who had a great deal of anxiety and had been through a large amount of trauma could feel heightened anxiety if he or she is in a situation perceived as threatening. He further explained that, on the other hand, someone with significant depressive disorder and an anxiety disorder often has low self-esteem and may feel that he or she deserves the conduct or does not have the right to act.

Defense counsel questioned Dr. Ofenloch about the Defendant's statement to police that "before I knew it, I shot" the victim and asked him whether "[t]hat's a phrase that would work" in a situation of heightened tension where a person draws a gun on the shooter, who then instinctively shoots the person. Dr. Ofenloch testified that "certainly can happen" and that "often times we're put in situations where we just have to react immediately." He stated that in other situations, those with past trauma will "basically zone out" during the period and have a "dissociative period where they do something and they're not really there in the moment." He also stated that while prior abuse can affect a person's response to threats, "I wasn't in her brain in that case." He understood that the Defendant had repeatedly experienced infidelity but that "her tendency has been to take too much, to just keep putting up with it."

On cross-examination, Dr. Ofenloch acknowledged that he was not an expert in forensic psychology and did not know the legal definition of self-defense. He testified that although he never officially diagnosed the Defendant with PTSD, the treatment would not have differed from the treatment that the Defendant had been receiving. According to his notes, most of the Defendant's complaints in the years prior to the

shooting centered around her issues with other family members. In June 2016, the Defendant reported to Dr. Ofenloch that the victim apparently had a psychotic break, which required hospitalization, that the cause of the break did not appear to be drug-induced, and that the victim appeared to be improving but was still not himself. In November 2016, the Defendant told Dr. Ofenloch that she wanted a divorce, that the victim claimed he had nowhere to go, that she believed the victim was trying to control her, that the victim remained in bed most days due to back pain, and that they survived solely on her income. Dr. Ofenloch agreed that the Defendant did not report that the victim physically abused her or threatened her with bodily injury or death.

The fifty-two-year-old Defendant testified that she first married the victim in September 1984 when she was seventeen years old and he was eighteen years old. They divorced after one to one and one-half years of marriage. The Defendant acknowledged that during their first marriage, they "got into a few little tisks" where they "wound up with hands on each other." They remarried in May 2013. She said that she agreed to marry the victim a second time under the conditions that he refrain from drinking liquor or "using a needle" and that the victim agreed to abide by the conditions. She stated that "[i]t was like Jekyll and Hyde syndrome with [the victim] and liquor. If he's sober you couldn't ask for a better person. If he drank you couldn't tolerate him."

The Defendant testified that during the December 2015 incident, the victim stabbed the screen of her cell phone with scissors to prevent her from calling 911. Sometime after the incident, the Defendant saw text messages that the victim had sent to another woman. When the Defendant confronted the victim, he denied sending the messages and told her and others that she was "crazy." The Defendant testified that the incident witnessed by Ms. Sneed when the Defendant attempted to open the safe to remove her coins occurred after the December 2015 biting incident and after the victim had been drinking alcohol throughout the day. The Defendant recalled that Ms. Cornett told her that after she and the victim argued, the victim would come to Ms. Cornett's home "ranting and raving" and threatening to kill the Defendant. The Defendant testified that when the victim was "mad enough," he would threaten to kill her and that he had made such threats approximately one week prior to the shooting.

The Defendant also was aware that the victim had threatened others, including a man from Spring City and a judge who presided over the victim's divorce with an ex-wife. The Defendant once saw the victim point a gun at her daughter's father. The victim also informed her of his fights with an ex-wife and told her that his ex-wife "could take a hit for a woman, that it was nothing to knock her down and her to get up and gun at him, like she wanted more." The victim told the Defendant that during an altercation with police officers, he broke one officer's arm and knocked out another officer.

The Defendant recalled that the victim had a psychotic episode during which he began "rambling on about demons" and had conversations with people who were not there and that the victim required hospitalization. The Defendant testified that during the three weeks prior to the shooting, the victim began exhibiting behavior such as discussing "burning people's houses, hurting people, killing them, how it would be a rush, and just off-the-wall stuff like that." The Defendant stated that she was concerned for her safety and the safety of her family members. She recalled that the victim also had an altercation with her brother.

The Defendant testified that the victim carried a small revolver, the Bodyguard, in his pocket at all times. The victim also kept a .38 special in the console of his vehicle. The Defendant stated that for the three weeks prior to the shooting, the victim had been leaving the home at least one night a week. The victim also had been drinking alcohol often and taking a large amount of pills. When the Defendant would ask him where he had been, he would respond, "[T]he less you know…the better."

On the evening of the shooting, the victim left the home and returned one or two hours later, after dark. The Defendant testified that she knew that the victim had been drinking and that whenever he drank, she would change the combination of the black safe in the master bedroom to prevent the victim from retrieving the weapons and ammunition stored there. The victim tried to open the safe. When he was unable to do so, he demanded that the Defendant open the safe; she refused; and they began arguing. The Defendant stated that she was "pretty sure" that the victim walked over to the bed and retrieved the Glock that he sometimes kept between the box springs and mattress on his side of the bed. She did not see the victim retrieve the Glock from that area because as they were arguing, she left the master bedroom and entered the bathroom a few times. She stated that the victim put the Glock to her forehead and stated that he had nowhere to go if she kicked him out of the home because the Defendant took everything away from him when she had him move back in with her. The victim threatened to call the Defendant's doctors and threatened to ensure that she would be unable to see her granddaughter again. The Defendant said that the victim was waving the gun while threatening her and that she was afraid that he was going to kill her.

The Defendant testified that they continued to argue while standing in a passageway that separated the bed from a dresser and a small refrigerator. The victim sat down on "his side" of the bed, which the Defendant later clarified was the right side of the bed. Photographs of the master bedroom showed a nightstand beside the victim's side of the bed, a small walkway, and the dresser and refrigerator on the other side of the walkway and against the wall. The victim stood up, removed the Bodyguard from his pocket, and laid it on the corner of the refrigerator. He continued to point the Glock at the Defendant while threatening her. The Defendant stated that the victim reclined on the

bed and was "[n]ot completely laying down, but not completely sitting." She said that the victim laid the Glock down on the bed but never took his hand off of it. The Defendant stood between the bed and the small refrigerator, and the victim began waving the Glock again. She stated that "[b]efore [she] could even think," she picked up the Bodyguard off the refrigerator and shot the victim. She said she was afraid and believed the victim was going to shoot her. She explained that the victim had never held a gun on her for such a long amount of time and that "[t]here was a different in the tone of his voice and just the whole argument, the look, plus everything that he had been saying."

The Defendant testified that after she shot the victim, he attempted to get up, was talking to her, and had a gun in his hand. The Defendant ran to the other side of the bed to retrieve the keys to the victim's car, which were on the nightstand. She said that when she grabbed the keys, she heard the victim "mumble" with the gun still in his hand. She stated that she believed "he was going to sit up with the gun, and I shot again." She agreed that "from start to finish," she believed the victim was going to kill her. She ran out of the house, got into the car, and drove away. By the time that she could "think or process any type of thought," she was north of Knoxville, and she turned around and returned home.

The Defendant did not know why she did not call 911 upon returning home and did not know whether the victim was alive at that point. When asked what she recalled about cleaning up the scene, the Defendant stated that "I know that when I went in I just—I completely lost it. All I could think of was—I don't even know if I was thinking" and that "it was almost like I was just doing the motions." She retrieved a small garden wagon that was on her porch and rolled the victim's body into the wagon. She was unable to move the victim's body any further than the kitchen. She stated that all of the items used in cleaning the scene were already in her home. The Defendant said she thought of taking the linens and throwing them off the cliff because "it was in [the victim's] little scenario" when he threatened to kill her. She maintained that she was not thinking clearly when she ran off the road, causing her car to be stuck. Before discarding the linens, she threw the Bodyguard off a bridge. The Defendant testified that the Glock was still in the victim's left hand when she returned home following the shooting and that she put the Glock into the safe while she was cleaning the scene.

The Defendant agreed that her original story to the police about the victim's death was untrue. She also agreed that her statements to Mr. Roberson were untrue, and she did not recall having a second telephone conversation with him. She did not know why she failed to tell the police about the other incidents of abuse by the victim and stated that she only told the officers about the incident where she called the police.

On cross-examination, the Defendant testified that the victim had not been drinking alcohol before he left the home on April 23rd. She acknowledged that when she and the victim initially began arguing, she could have left the home but stated, "If I walked out on every argument that we had, I would never be at home." She said they likely argued "for a good half an hour." She acknowledged that during the argument, she brought up the victim's text messages to another woman but denied that she was angry about the text messages. They also argued about the victim's leaving often, and the victim told the Defendant that it "wasn't [her] business." While the Defendant acknowledged she was "hurt," she denied that she was angry.

The Defendant testified that she never saw the victim retrieve the Glock, but she acknowledged that she told the police that the victim retrieved the gun from the safe. She said that the victim removed the Bodyguard from his pocket and laid it on the corner of the refrigerator next to his right hand, that she was standing beside the refrigerator, and that the victim held the Glock in his left hand. The victim did not do "a completed flat lay down" on the bed, but his feet were up on the mattress. The Defendant stated that they continued to argue while the victim pointed the Glock at her and that she picked up the Bodyguard and shot him. She testified that "it was not something I thought about. I just picked the gun up and shot." She denied that she aimed the gun before shooting and maintained that she did not intend to hit him. She walked to the other side of the bed to retrieve the car keys and turned around once she heard the victim make a noise. She did not know whether the victim was saying anything. She stated that she shot the victim a second time once she saw him "moving and he still had the gun." She did not know whether the victim was alive or dead when she left the house.

The Defendant testified that she did not know what she planned to do with the victim's body, stating, "I don't know that I was trying to get him out the door. I don't know what I was doing. My mind was racing so bad, and I was so—I wasn't thinking period." She stated that she did not know whether she was attempting to make it appear that someone had entered the house and killed the victim but then stated, "I think maybe." She maintained that wrapping the victim in plastic with tape "was something that just happened. It wasn't anything I gave thought to, I just [did] it."

The Defendant agreed that she initially lied to the police about how the victim was killed and that after Detective Bice sympathized with her, she provided another version of events. She did not know why she did not immediately call the police and report that she shot the victim after he tried to kill her. She testified that although she told Detective Bice that the victim had taken the Glock to the safe, she maintained that the victim was holding the Glock when she shot him. Later, the Defendant's mother and another person retrieved the Glock from the safe and brought it to defense counsel. The Defendant stated that she, and not the victim, placed the Glock in the safe.

- 19 -

Dr. Valerie Radu, a licensed clinical social worker and the executive director of the Family Justice Center in Chattanooga, performed a comprehensive clinical assessment of the Defendant. Dr. Radu testified that she reviewed Dr. Ofenloch's files, the transcript of the Defendant's interview with police, other materials related to the charges against the Defendant, the criminal complaint against the victim in December 2015, and other documents relating to the Defendant's history of abuse. She also interviewed the Defendant on June 11, 2019.

Dr. Radu testified that the Defendant had a history of emotional and psychological distress and trauma that began in childhood. Dr. Radu stated that as a result, the Defendant experienced depression, anxiety, and a variety of psychological and mental health issues that caused her distress and impaired her function. Dr. Radu said the Defendant's functioning was impaired at the time of the shooting and at the time of trial. Dr. Radu opined that the Defendant suffered from depression and severe anxiety and that she had symptoms of PTSD. Dr. Radu explained that the Defendant's most dominant symptom of PTSD was a sense of hypervigilance in that the Defendant had difficulty sleeping, sometimes experienced nightmares, and was "always kind of operating at a very high level of alertness and awareness of her surroundings." Dr. Radu stated that these symptoms were "amplified" after the shooting but that she could not state the precise time when the symptoms began. Dr. Radu testified that the Defendant appeared to have a dissociative episode following the shooting when she drove away from the scene.

Dr. Radu testified that during an abusive intimate partner relationship, a power and control cycle occurs where the abuser obtains control over his or her partner and threatens or berates the partner on a regular basis in order to make the partner feel dependent upon the abuser. She agreed that a partner's depending upon the abuser for transportation or the abuser's threatening to cause the partner to lose custody of a grandchild are parts of the power control cycle. She stated that emotional abuse usually precedes physical abuse. Dr. Radu testified that although no mention of domestic violence was included in Dr. Ofenloch's notes, trauma can cause a person to repress experiences and not share them. She stated that some people also feel "shame" from suffering abuse so that they will not disclose it. Dr. Radu noted that when Detective Bice gave the Defendant an opportunity to disclose the abuse, she only provided the one instance during which the police were called. She acknowledged that the Defendant stated she was embarrassed by the abuse.

Dr. Radu assessed the Defendant's Lethality Assessment Protocol and determined that if this protocol would have been administered following the incident of abuse in December 2015 that required police response, the Defendant would have fallen into the high risk category, meaning that she would have had a very high risk of being fatally injured during the next instance of abuse. Dr. Radu testified that whenever she has a

client who receives such an assessment, she recommends that the client go to a domestic violence shelter and obtain an order of protection before returning home. She stated that it appeared that Officer Combs, who responded to the scene, had the necessary training and followed the protocol by offering the Defendant the opportunity to go elsewhere. Dr. Radu described the combination of alcohol and weapons in an abusive relationship as "lethal." She stated that the victim and the Defendant had "a very high conflict, emotionally charged relationship" that, when combined with alcohol, escalated "to a dangerous level."

When asked about the Defendant's statements that she shot "before I knew it" and that she "didn't think," Dr. Radu explained that safety is one of the functions of the brain that is "primordial" and that when brains have been exposed the trauma, "people just have an automatic response to protect themselves when they feel threatened. And again, that goes back to that hypervigilance, always being kind of on guard and just fearful, because you've been exposed to that for so long." She stated this response could occur regardless of whether the person had been exposed to trauma or shared the Defendant's diagnosis. When asked about a spouse's finally shooting an abuser after the abuser threatens the spouse with a gun on prior occasions, Dr. Radu stated, "I think sometimes people just reach their limit or the brain, that lower brain just comes in and the trauma and everything is triggered, I mean, I don't think I could say a hundred percent." She testified that the shooting did not appear to have been premeditated.

Dr. Radu testified that she was not a forensic expert but was an expert on domestic violence. On cross-examination, she acknowledged that she was not a psychiatrist or a psychologist and was not an expert in forensic psychology. She agreed that the bulk of her experience was in elder abuse. She had never testified as an expert in domestic violence in a criminal case but had testified as such an expert in civil trials, such as child custody cases.

Dr. Radu testified that she first met with the Defendant one week prior to trial. She met with the Defendant for ninety minutes, spending forty-five minutes talking to her and the remainder of the time administering tests. Dr. Radu reviewed the material that she had been provided one week prior to interviewing the Defendant, and she generated a report one day after the interview. Dr. Radu acknowledged that the Lethality Assessment Protocol was an assessment for an event that occurred in real time and was not supposed to be used to assess an event that occurred years prior to the assessment. She acknowledged that she administered the PHQ9, a self-report test to assess emotional and psychological state, but that she did not follow the recommendation that the test be administered again at a two-week interval to provide a true picture of the person's emotional and psychological state. She agreed that her failure re-administer the test would "[p]erhaps" affect the reliability of the results of the test. Dr. Radu also

administered the Kessler Psychological Distress Scale, K10, a self-reported instrument which measures the symptoms of anxiety and depression in the most recent four-week period. Dr. Radu did not attempt to confirm the Defendant's answers with an independent source.

Dr. Radu agreed that the Defendant's statements to her and the transcript of the statement to the police were the only sources from which to ascertain the Defendant's state of mind at the time of the shooting. Dr. Radu also agreed that Dr. Ofenloch's records included no mention of any violent act perpetrated by the victim and that the Defendant provided more information about the victim's violent history than what was included in Dr. Ofenloch's records. Dr. Radu opined that the Defendant did not suffer from PTSD prior to shooting the victim and that the symptoms did not develop until after she pulled the trigger. Dr. Radu agreed that the Defendant's delay in reporting the shooting could have been due to fear and that such fear could include fear of going to prison.

At the conclusion of the proof, the jury convicted the Defendant of first degree premeditated murder, and the trial court imposed a sentence of life imprisonment. The Defendant filed a motion for new trial, which the trial court denied. She then filed a timely notice of appeal.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to support her conviction for first degree premeditated murder. The State responds that the Defendant waived this issue by failing to designate the issue in her statement of the issues in her appellate brief. *See* Tenn. R. App. P. 27(a)(4) (requiring that an appellant's brief include a statement of the issues presented for review); *Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012) (providing that "an issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4)"). Although the Defendant failed to designate the issue in her statement of issues, we nevertheless elect to address the issue, and we agree with the State that the evidence is sufficient to support the Defendant's conviction.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all

reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

First degree murder is the premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1) (2017). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a). A premeditated act is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id.*

On appeal, the Defendant does not challenge the sufficiency of the evidence as it relates to the specific elements of first degree premeditated murder. Rather, she maintains that the evidence establishes that she acted in self-defense. As the trial court instructed the jury, Tennessee Code Annotated section 39-11-611(b)(2) (Supp. 2017) provides in pertinent part that

> a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C)   The belief of danger is founded upon reasonable grounds.[1]

The State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense.  T.C.A. § 39-11-201(a)(3); *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001).  Whether the defendant acted in self-defense is a matter for the determination of the jury as the trier of fact.  *State v. Dooley*, 29 S.W.3d 542, 547 (Tenn. Crim. App. 2000); *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

The evidence presented at trial established that the Defendant shot the victim twice, once on either side of his head.  Rather than call 911, the Defendant drove north of Knoxville before returning home to clean the scene.  She rolled the victim off the bed and into a small wagon and transported him to the kitchen floor.  She wrapped the victim's body in plastic garbage bags, secured the bags with tape, and placed a blanket on top of the victim.  She gathered the bloody linens and a bloody towel and threw them over a bluff approximately nine miles away from her home.  She threw the Bodyguard used to shoot the victim over a bridge and into a river.

The Defendant did not call 911 until the next day after the shooting.  She first called Mr. Roberson and "chitchat[ted]" with him before telling him that she returned home to find the victim on the floor and that she did not believe the victim was breathing.  Mr. Roberson urged her to call 911 and ended the call.  Mr. Roberson later called the Defendant and asked whether the ambulance had arrived only to learn that the Defendant had not yet called 911.  He again instructed her to call 911 and ended the call.  When the Defendant finally called 911, she calmly reported that she returned home to find the deceased victim on the kitchen floor and underneath a blanket and that the victim appeared to have been shot in the head.  Officers who responded to the scene reported smelling a strong odor of bleach inside the home.  A load of clothes was being washed in the washing machine, and among the clothing in the washing machine was a pair of shoes with blood on them.

The Defendant repeated her claim of returning home and finding the deceased victim on the floor to both the responding officer at the scene and Detective Bice during a formal interview.  It was only after Detective Bice challenged her claims and expressed sympathy that the Defendant claimed she shot the victim in self-defense.  While the Defendant testified at trial that the victim was holding a Glock when she shot him both times, she told Detective Bice that the victim had placed the Glock inside a safe.  The

---

[1] We note that the statute has been amended by deleting the language regarding "not engaged in unlawful activity" and substituting "not engaged in conduct that would constitute a felony or Class A misdemeanor." 2021 Tenn. Pub. Laws ch.115, § 3.

Defendant acknowledged that the victim had placed the Bodyguard on the corner of a small refrigerator before lounging on the bed. She did not claim that the victim was reaching for the Bodyguard when she grabbed it and shot him, and the photographs of the scene show that the Bodyguard would not have been within the victim's reach if he was on the bed. The jury clearly chose to reject the Defendant's testimony in support of self-defense, and this court will not revisit such a credibility determination on appeal. *See State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Rather, we conclude that the evidence is sufficient to support the Defendant's conviction for first degree premeditated murder.

## II. Limitation of Cross-Examination of State's Witnesses

The Defendant maintains that the trial court erred in prohibiting defense counsel from questioning the State's witnesses on cross-examination regarding the Defendant's statement to the police following the shooting and the victim's prior instances of violence, including domestic violence by the victim against the Defendant and other acts of violence by the victim, and reputation for violence within the community. The Defendant asserts that by limiting defense counsel's cross-examination of the State's witnesses, the trial court denied her constitutional right to conduct an effective cross-examination.

Cross-examination is a fundament right under the Confrontation Clause of the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. Brown*, 29 S.W.3d 427, 430-31 (Tenn. 2000). However, "[w]hile the right of cross-examination is fundamental, its exercise is controlled by the discretionary authority of the trial judge." *State v. Zirkle*, 910 S.W.2d 874, 890 (Tenn. Crim. App. 1995). Generally, "'the propriety, scope, manner and control of the examination of witnesses'" lies within the court's discretion. *State v. James*, 315 S.W.3d 440, 460 (Tenn. 2010) (quoting *State v. Caughron*, 855 S.W.2d 526, 540 (Tenn. 1993)). Accordingly, "'a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation.'" *State v. Wyrick*, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001) (quoting *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994)). An unreasonable restriction of the right to cross-examine witnesses constitutes an abuse of discretion. *State v. Echols*, 382 S.W.3d 266, 285 (Tenn. 2012); *see State v. Gentry*, 538 S.W.3d 413, 429 (Tenn. 2017). Because the right is constitutional, "[w]hen a defendant is denied the right to conduct an effective cross-examination, the conviction will stand only if the violation is deemed harmless beyond a reasonable doubt." *Echols*, 382 S.W.3d at 285.

Under Tennessee Rule of Evidence 404(a):

(a) **Character Evidence Generally**. Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

…

(2) *Character of Alleged Victim.* In a criminal case, and subject to the limitations imposed by Rule 412, evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a homicide case to rebut evidence that the alleged victim was the first aggressor….

The method of proving a character trait under Rule 404(a), when such evidence is admissible, is governed by Tennessee Rule of Evidence 405. *See State v. John D. Joslin*, No. 03C01-9510-CR-00299, 1997 WL 583071, at *36 (Tenn. Crim. App. Sept. 22, 1997). Rule 405 states:

(a) **Reputation or Opinion.** In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. After application to the court, inquiry on cross-examination is allowable into relevant specific instances of conduct. The conditions which must be satisfied before allowing inquiry on cross-examination about specific instances of conduct are:

(1) The court upon request must hold a hearing outside the jury's presence,

(2) The court must determine that a reasonable factual basis exists for the inquiry, and

(3) The court must determine that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues.

(b) **Specific Instances of Conduct.** In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

Tenn. R. Evid. 405; *see* Tenn. R. Evid. 405 Advisory Comm'n Cmt. (noting that specific instances under subsection (b) must be an essential element of a cause of action or defense, e.g., whether "the defendant who called a defamed plaintiff a 'crook' can prove the plaintiff embezzled funds").

"When a defendant relies on a theory of self-defense and that the alleged victim of a violence crime was the first aggressor, the defense may present evidence of the victim's prior history of violent conduct." *State v. Eddie Smith*, No. W2018-01509-CCA-R3-CD, 2020 WL 3572071, at *11 (Tenn. Crim. App. June 30, 2020), *perm. app. denied* (Tenn. Dec. 3, 2020) (citing *State v. Ruane*, 912 S.W.2d 766, 781-82 (Tenn. Crim. App. 1995), *abrogated on other grounds by State v. Rogers*, 992 S.W.2d 393, 401 (Tenn. 1999)). "There is a distinction between evidence of prior acts of violence by the victim used to corroborate the defense theory that the victim was the first aggressor and that used to establish the defendant's fear of the victim." *Ruane*, 912 S.W.2d at 779. "When the defendant's fear of the victim is relevant and the defendant is aware of the prior acts, the defendant may testify concerning his knowledge of the victim's violent conduct." *Eddie Smith*, 2020 WL 3572071, at *11 (citing *State v. Hill*, 885 S.W.2d 357, 361 n.1 (Tenn. Crim. App. 1994); *State v. Samuel Sherrill*, No. M2009-01979-CCA-R3-CD, 2011 WL 1564009, at *7 (Tenn. Crim. App. Apr. 21, 2011)). This evidence is substantive proof of the defendant's subjective state of mind. *Id.* (citing *L.B. Rittenberry, Jr., v. State*, No. M2016-00409-CCA-R3-PC, 2017 WL 1278677, at *5 n.4 (Tenn. Crim. App. Apr. 5, 2017); *State v. Chancy Jones*, No. W2010-02424-CCA-R3-CD, 2012 WL 1143583, at *7 n.6 (Tenn. Crim. App. Apr. 5, 2012)).

"The defendant need not be aware of the victim's prior violent acts at the time of the alleged self-defense in order to use the evidence for the limited purpose of corroborating the defendant's self-defense claim." *Chancy Jones*, 2012 WL 1143583, at *7 (citing *Ruane*, 912 S.W.2d at 781-82) (footnote omitted). Evidence which is admitted solely to corroborate other evidence that the victim was the first aggressor does not fall under Rule 404(a)(2) or 405. *Id.* Before corroborating evidence regarding the victim being the first aggressor may be introduced, there must be some evidence raising the issue that the victim was the first aggressor. *Eddie Smith*, 2020 WL 3572071, at *11. Prerequisites to the admission of prior violent acts by the victim are that:

> (1) the issue of self-defense must be raised by the proof and not simply by statements of counsel; (2) there must be a factual basis underlying the defendant's claim that the victim had first aggressor tendencies; and (3) the trial court must determine whether the probative value of the evidence is outweighed by the danger of unfair prejudice.

*Id.* at *12.

The Defendant contends that the trial court erred in denying defense counsel's request to cross-examine witnesses regarding the Defendant's statement to police. The Defendant does not identify in her brief the witnesses whom she believes defense counsel should have been allowed to question about her statement, or the portions of the

statement about which those witnesses should have been questioned. Prior to trial, the parties and the trial court engaged in a discussion regarding whether defense counsel would be allowed to introduce the Defendant's statement and question Detective Bice about his comments during the interview in the event that the State did not introduce the Defendant's statement as evidence in its case in chief. However, the State did introduce the Defendant's statement to police during Detective Bice's testimony, and defense counsel questioned Detective Bice extensively on cross-examination regarding both his and the Defendant's statements during the interview, as well as Detective Bice's knowledge of the victim's prior violent acts and his reputation in the community. The Defendant has failed to establish that the trial court erred or that she is otherwise entitled to relief.

The Defendant next asserts that the trial court erred in prohibiting defense counsel from questioning Ms. Louallen, Deputy Akins, and Detective Hall on cross-examination about their knowledge of prior instances of domestic violence by the victim against the Defendant, any other prior acts of violence by the victim, and the victim's reputation for violence in the community. Ms. Louallen, Deputy Akins, and Detective Hall were the first three witnesses presented by the State at trial, and the trial court denied defense counsel's request to cross-examine these witnesses regarding the victim's prior bad acts and reputation because the issue of whether the Defendant acted in self-defense had not yet been raised by the proof. The Defendant argues that the trial court should have allowed defense counsel to make an offer of proof during a hearing outside the presence of the jury to establish that the issue of self-defense would be raised by other evidence presented during the trial.

The Defendant, however, failed to question Ms. Louallen and Detective Hall outside the jury's presence to ascertain what their testimony would have been regarding their knowledge of the victim's prior acts of violence and reputation in the community. The Defendant's failure to make an offer of proof regarding what any additional cross-examination of these two witnesses would have revealed precludes this court from reviewing the issue. *See State v. McCaleb*, 582 S.W.3d 179, 199 (Tenn. 2019) (holding that the State's failure to make an offer of proof regarding the excluded evidence precluded the trial court from making specific findings regarding the proposed testimony and precluded the appellate court from considering the issue); *State v. Hall*, 958 S.W.2d 679, 691 n. 10 (Tenn. 1997) ("[G]enerally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded.").

With respect to Deputy Akins, he testified on cross-examination that he had been to the home of the Defendant and the victim on a few prior occasions. He stated that he was at the home once in December 2015, during which time Detective Bice also was present. The State objected to the testimony, and defense counsel responded that he was

"laying the groundwork" and that the questions were based upon an affidavit of complaint completed by Officer Combs on December 7, 2015, charging the victim with domestic assault of the Defendant. Deputy Akins testified outside the jury's presence that he had no knowledge of the underlying facts and that he went to the home on the following day to assist in executing the arrest warrant. Defense counsel informed the trial court that he was "just laying the groundwork that officers have been out and around that house" and that he would recall Deputy Akins and would "raise with this officer these other questions that at the moment I'm barred from raising." Defense counsel never questioned Deputy Akins during the jury-out hearing regarding his observations or any incidents that occurred while executing the arrest warrant. Defense counsel also did not recall Deputy Akins as a witness during the presentation of the defense proof.

Defense counsel made it clear during the jury-out hearing that the purpose of the cross-examination of Deputy Akins was only to "lay[ ] the groundwork" that officers responded to the home on prior occasions. Prior to the State's objection, defense counsel was able to elicit testimony that Deputy Akins previously responded to the home and that Detective Bice also came to the home. The proffered testimony of Deputy Akins during the jury-out hearing did not establish Deputy Akins's knowledge of any prior acts of violence committed by the victim or the victim's reputation in the community. Given Deputy Akins's limited proffered testimony, we conclude that the Defendant has failed to establish that the trial court erred in excluding the testimony. Furthermore, even if the trial court's ruling denied the Defendant the right to conduct an effective cross-examination of Deputy Akins, any such error is harmless beyond a reasonable doubt in light of the extensive evidence presented by the Defendant of the victim's prior violent acts and reputation, including the circumstances of the victim's prior domestic assault of the Defendant in December 2015 and the threats that the victim levied against the police officers who arrived at the home to arrest him. *See Echols*, 382 S.W.3d at 285 ("When a defendant is denied the right to conduct an effective cross-examination, the conviction will stand only if the violation is deemed harmless beyond a reasonable doubt.").

### III. Remaining Issues

The Defendant listed three additional issues in her appellate brief under her statement of issues: (1) whether the State committed prosecutorial misconduct by misstating the evidence during closing argument; (2) "[w]hether the court erred by allowing the hearsay statements of the initial victim statement to her mother and then the mother's statement to 911 as excited utterances"; and (3) "[w]hether the court erred by imposing a sentence of 30 years rather than the minimum of 25 years." The Defendant, however, does not argue these issues anywhere in her brief. *See* Tenn. R. App. P. 27(a)(7) (requiring that an appellant's brief include an argument setting forth the appellant's contentions with respect to the issues presented). Accordingly, these issues

- 29 -

are waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). We note that with regard to the second issue, the evidence established that the Defendant called 911 and that there was no evidence presented that the victim made statements to his mother or that his mother called 911. With regard to the Defendant's claim regarding an excessive sentence, the trial court did not impose a thirty-year sentence but imposed a term of life imprisonment, the minimum sentence available for a first degree murder conviction. *See* T.C.A. § 39-13-202(c)(3). Accordingly, the Defendant is not entitled to relief.

## CONCLUSION

Based upon our review of the record, the parties' briefs and oral argument, and the applicable law, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE